UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael J. Bee,                                             Civil No. 07-3576 (DWF/JJK)

          Plaintiff,

v.                                                                            **MEMORANDUM**
                                                                        **OPINION AND ORDER**

BNSF Railway Company,
d/b/a Burlington Northern
Santa Fe Railway Company,

          Defendant.

_____

Joni M. Thome, Esq., Halunen & Associates, counsel for Plaintiff.

Diane P. Gerth, Esq., and Rodney A. Honkanen, Esq., Spence, Ricke, Sweeney & Gernes, P.A., counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court upon the motion for summary judgment of Defendant BNSF Railway Company, doing business as Burlington Northern Santa Fe Railway Company ("BNSF"), in which BNSF requests summary judgment as to claims brought against it by Plaintiff Michael J. Bee ("Bee"). For the reasons set forth below, the Court grants BNSF's motion.

## BACKGROUND

Bee worked for BNSF as a Centralized Traffic Control Maintainer ("CTC Maintainer") in Willmar, Minnesota, from July 2005 until he was terminated by BNSF on

September 12, 2006.  As a CTC Maintainer, Bee's job required him to test and maintain signal equipment along the railroad tracks within an assigned geographic territory.  Bee alleges that he was fired because he brought safety violations to the attention of his superiors and that his termination violated Minnesota's whistleblower protection statute, Minn. Stat. § 181.932.

Bee alleges that he reported safety and other violations of Federal Railroad Administration ("FRA") regulations to his supervisors on numerous occasions and that his supervisors retaliated against him for doing so.  For instance, Bee alleges that he presented his supervisors with a list of defective and worn-out equipment, but indicates that most of the problems he identified were never fixed and that he was told there was insufficient money in the budget to repair or replace these items.  (Aff. of Joni M. Thome ("Thome Aff.") ¶ 1, Ex. A at 108, 111.)  Bee indicates that when he continued to report problems with this equipment, his managers responded by "screaming, degrading, harassing, [and] putting [him] down."  (*Id.* ¶ 1, Ex. A at 157.)

Bee alleges that he was required to work in excess of the hours permitted under federal law for four days in a row in 2006, and that when he reported the situation to his supervisor, the supervisor yelled and cursed at him and told him to keep working.  (*Id.* ¶ 1, Ex. A at 164, 166-168, 170, 174-176.)  Bee further alleges that he was directed to give a train a "false clear," by operating a toggle switch by hand in order to show the train a green light instead of a red light, at a time when a crew was working on that section of track.  (*Id.* ¶ 1, Ex. A at 202-204.)  Bee indicates that he refused because doing so would violate safety regulations and that afterwards his supervisors lectured him about

his "attitude." (*Id.* ¶ 1, Ex. A at 209-210.) Bee also alleges that his supervisor yelled at him and threatened to dock his pay after he determined a certain switch along the rail line should be taken out of service because it was not operating properly. (*Id.* ¶ 1, Ex. A at 213-214.)

In addition to yelling at him and cursing him, Bee alleges his supervisors took other retaliatory actions against him for reporting safety violations. Bee indicates that in March 2006 he received a negative performance review, which stated that he only met "minimum requirements," and he was told there was a problem with his "attitude" and that he was "needy." (*Id.* ¶ 1, Ex. A at 217-219.) Bee believes he was "singled out" and "harassed" because he reported safety violations. (*Id.* ¶ 1, Ex. A at 245-247.) Bee contends that he ultimately was terminated because he continued to report safety violations; Bee stated that he "was the only one that [he] knew of that was really turning in safety issues. Everybody else was pretty much afraid." (*Id.* ¶ 1, Ex. A at 298-299.) Bee also stated that, "[g]etting rid of me saved them." (*Id.* ¶ 1, Ex. A at 299.)

BNSF disputes Bee's claims that it retaliated against him for reporting safety concerns. BNSF notes that Bee's job required him to bring safety issues to the attention of his superiors and to complete forms indicating the results of equipment testing on forms that are available to the FRA. (Aff. of Michael Koetter ("Koetter Aff.") ¶ 5.) BNSF also notes that Bee acknowledges that he and his supervisor walked a portion of track in his assigned territory together to review the condition of the equipment and that his supervisor seemed pleased that Bee was ambitious about fixing equipment. (Thome Aff. ¶ 1, Ex. A at 108.)

3

BNSF contends that the issues Bee raised were not violations of law or regulations, but merely equipment maintenance issues.  (*Id*. ¶ 4, Ex. C at 31-32.)  BNSF also indicates that equipment Bee brought to his supervisor's attention was, in fact, replaced, and that Bee was able to adjust other equipment to ensure compliance with applicable standards.  (*Id*. ¶ 1, Ex. A at 140-141, 158, 163.)  BNSF disputes that Bee's supervisor yelled at him and threatened to dock Bee's pay for taking a switch out of service.  (*Id*. ¶ 4, Ex. C at 67-68.)

BNSF also disputes Bee's allegation that he worked in excess of the time permitted under federal law.  BNSF notes that, according to Bee's time sheets, he worked more than twelve hours on only two days, not four days as Bee alleged.  (Aff. of Kevin Ruud ("Ruud Aff.") ¶ 5, Ex. A at 3.)  BNSF further contends that the additional work time was permissible under federal regulations because the work was being performed at a crossing, making it an emergency, and that the time was authorized by a supervisor.  (Thome Aff. ¶ 4, Ex. C at 119-122.)

BNSF denies that Bee's termination was retaliatory.  BNSF argues that Bee was fired because he left work early on July 28, 2006, without notifying his supervisor or obtaining permission, and subsequently reported on his time sheet that he had been at work for the entire day.  Bee acknowledges that he left work early, without permission to do so, at around 12:00 P.M.[1]  (*Id*. ¶ 1, Ex. A at 267-268.)  Bee also acknowledges that he

---

[1] During the disciplinary investigation into his conduct, Bee was asked about the time he left work that day and suggested in one instance that he left work at "approximately" 2:12 P.M., however, during hearing testimony on another day Bee stated
(Footnote Continued on Next Page)

4

submitted a time sheet claiming eight hours of work for July 28, 2006, even though he had not worked eight hours that day, but contends that he did so accidentally.[2] (*Id.* ¶ 1, Ex. A at 268-269.) Bee admitted during a disciplinary hearing that he violated BNSF's rules by engaging in this conduct, and he admitted that his actions were insubordinate. (La Vere Aff. ¶ 5, Ex. A at 78, 80, Ex. B at 53, 54.) Bee argues, however, that other employees violated BNSF's rules and were not fired. Bee, therefore, claims that BNSF's reason for terminating him was a pretext and that the true reason was retaliatory.

Finally, BNSF argues that, whatever the facts regarding Bee's termination, provisions of the Federal Railroad Safety Act ("FRSA") in effect at the time of Bee's termination preempted the whistleblower protections provided by Minn. Stat. § 181.932. BNSF, therefore, argues that Bee's complaint should be dismissed. Bee disagrees and urges this Court to address the merits of this matter.

## DISCUSSION

**I.     Standard of Review**

---

(Footnote Continued From Previous Page)
he left between noon and 12:30 P.M. (Aff. of James LeVere ("LeVere Aff.") ¶ 5, Ex. A at 70, Ex. B at 47.)

[2]     There appears to be an inconsistency between Bee's statements regarding the submission of this time sheet. At his deposition, Bee stated that he was required to complete his time sheet before he did anything else for the day, and that he believed this could constitute time sheet falsification because his "day could change in a heartbeat." (Thome Aff. ¶ 1, Ex. A at 282.) Bee appears to be suggesting that he completed his time sheets in advance for each shift. During his disciplinary hearings, however, Bee stated that he filled in his time sheet each day by 9 A.M. for the previous day. (LeVere Aff. ¶ 5, Ex. B at 51, 52.)

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.,* 92 F.3d 743, 747 (8th Cir. 1996). A disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Planned Parenthood of Minn./South Dakota v. Rounds,* 372 F.3d 969, 972 (8th Cir. 2004); *Fenney v. Dakota, Minn. & E. R.R. Co.,* 327 F.3d 707, 711 (8th Cir. 2003).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank,* 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 256.

**II.    Preemption**

BNSF contends that the FRSA preempts Bee's claims under Minnesota's whistleblower protection law. The Court agrees.

A state law that conflicts with a federal law is preempted under the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2. *Hillsborough County, Fla. v.*

6

*Automated Med. Labs., Inc.,* 471 U.S. 707, 712-13 (1985).  Congressional intent to preempt state law can either be expressed in statutory language or implied in the structure and purpose of federal law.  *Id.*

The FRSA provides whistleblower protection to railroad employees who report violations of regulations related to railroad safety.  49 U.S.C. § 20109(a).  In 2006, when Bee was terminated by BNSF, the FRSA stated that claims under this section were "subject to resolution under section 3 of the Railway Labor Act (45 U.S.C. § 153) [("RLA")]."  49 U.S.C. § 20109(c) (2006).

Several courts have held that Congress intended this statute to provide an exclusive dispute resolution process for railroad whistleblower claims and thereby preempted state law whistleblower causes of action.  In *Rayner v. Smirl*, the plaintiff brought a wrongful discharge action under Maryland law claiming that he was terminated because he reported safety violations and was known as a whistleblower.  873 F.2d 60, 62 (4th Cir. 1989).  The Fourth Circuit concluded the plaintiff's state law claim was preempted by the FRSA's whistleblower protection provision, then codified at 45 U.S.C. § 441(c), because the FRSA was intended to provide "nationally uniform" standards of railroad safety and the whistleblower provision related to railroad safety.[3]  *Id*. at 65.  The

---

[3]  Bee contends that *Rayner* was implicitly overruled by *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994).  In *Hawaiian Airlines*, the Supreme Court held that the RLA did not preempt state law causes of action that involved rights and obligations independent of collective bargaining agreements.  512 at 256-260.  The FRSA does not substantively incorporate the RLA, but merely directs that whistleblower retaliation claims under the FRSA are to be resolved using the RLA's dispute resolution process.
(Footnote Continued on Next Page)

court declared that the comprehensive nature of the remedial scheme confirmed its preemptive scope and that Congress intended the remedy to be exclusive. *Id.*

Though the Eighth Circuit has not addressed this question, a district court within this circuit determined that a plaintiff's claims that he was terminated for reporting safety violations in violation of Iowa law were preempted by the FRSA. *See Sereda v. Burlington N. Santa Fe Ry. Co.*, No. 4:03-cv-10431, 2005 WL 5892133, *4-*6 (S.D. Iowa 2005). In *Sereda*, the Court held that Congress had explicitly expressed its intent to preempt state law causes of action by directing that whistleblower claims be subject to dispute resolution under the RLA and that contemporaneous and subsequent legislative history clearly confirmed this intent. *Id.* Similarly, in *Abbott v. BNSF Ry. Co.,* the court held that Congress had established the dispute resolution procedure provided by the RLA as the mandatory method for bringing retaliatory discharge claims and dismissed the plaintiff's claims under Kansas law. No. 2:07-cv-2441-KHV-JPO (D. Kan. Sep. 16, 2008).

This Court's analysis compels the same conclusion reached in these cases. Congress expressly provided protection against retaliation to those who have reported railroad safety violations and, in another subsection of the same statute, explicitly indicated that claims of retaliation must be heard under the dispute resolution procedures of the RLA. Congress's intent to provide an exclusive scheme for the resolution of

---

(Footnote Continued From Previous Page)
*Hawaiian Airlines* does not call into question *Rayner*'s interpretation of the FRSA provision at issue here.

retaliation claims is evident on the face of the statute.[4]  "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. General Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Based on the language of the statute, this Court concludes that Minnesota's whistleblower protection statute, Minn. Stat. § 181.932, was preempted by the FRSA at the time Bee was terminated.

### III.    Retroactive Application of Subsequent Amendment

Bee contends that his suit is exempt from preemption under a later amendment to the 49 U.S.C. § 20109.  In 2007, Congress amended the statute to provide that an employee who alleges "discharge, discipline, or other discrimination in violation of subsection (a) or (b) of this section, may seek relief in accordance with the provisions of this section, with any petition or other request for relief under this section to be initiated by filing a complaint with the Secretary of Labor."  49 U.S.C. § 20109(c)(1).  Congress also added a new subsection to the statute, titled "No preemption," which states that "[n]othing in this section preempts or diminishes any other safeguards against discrimination, demotion, discharge, suspension, threats, harassment, reprimand, retaliation, or any other manner of discrimination provided by Federal or State law."  49

---

[4]    The legislative history also indicates that Congress intended that the law have preemptive effect.  A report of the House Committee on Interstate and Foreign Commerce regarding the 1980 amendments to the FRSA, through which the whistleblower protection provision was enacted, stated that "the Committee intends [the RLA procedure] to be the exclusive means for enforcing this section," and that the "protections provided for . . . would be enforced solely through the existing grievance procedures provided for in section 3 of the [RLA]."  H.R. Rep. No. 96-1025 (1980), reprinted in 1980 U.S.C.C.A.N. 3830, 3832, 3840-3841.

U.S.C. § 20109(f).  Bee argues that the amended language should be applied retroactively in this case.

Where Congress has clearly indicated its intent that a statute apply retroactively its language controls, but where no such intent is clear from the face of the statute, a court must determine "whether the new statute would have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994); *see also Hughes Aircraft Co. v. U.S.*, 520 U.S. 939, 947 (1997) (stating that "[e]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective") (quoting *Soc'y for Propagation of the Gospel v. Wheeler,* 22 F. Cas. 756, 767 (No. 13, 156) (C.C.N.H.1814) (Story, J.)).  If a statute would operate retroactively, it is presumed not to govern unless Congress clearly intended otherwise. *Landgraf*, 511 U.S. at 272-273, 280 (noting that "[r]equiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits").

Bee argues that the amendment to 49 U.S.C. § 20109 merely shifts the venue for retaliation claims from the RLA as a tribunal to the jurisdiction of the courts and that it does not expose BNSF to any new liability.  Therefore, Bee argues that the change was procedural and has no substantive impact that would have retroactive consequences.  *See*

10

*Hamdan v. Rumsfeld*, 548 U.S. 557, 577 (2006) (stating that a jurisdiction-conferring or jurisdiction-stripping statute does not take away a substantive right but only alters the tribunal that may hear a case).  BNSF disagrees, noting that the amendment potentially subjects it to state law claims under fifty states' laws, which may be heard in state and federal courts around the country, rather than one whistleblower protection statute requiring claims to be brought according to one designated scheme.

In *Landgraf*, the Supreme Court considered whether to permit retroactive application of a statutory amendment that created a right to a trial by jury when a plaintiff sought compensatory or punitive damages, which were newly authorized by the statute.[5] 511 U.S. at 208-281.  The Court concluded that the jury trial provision alone would have been a purely procedural change to be applied in all trials after its effective date.  *Id*. at 280.  The new jury trial right, however, was tied to a plaintiff's right to seek compensatory and punitive damages, a provision which the Court considered a substantive change.  *Id*. at 281.  The Supreme Court stated that "[r]etroactive imposition of punitive damages would raise a serious constitutional question," as punitive damages share key characteristics with criminal sanctions.  *Id*.  The Court also found the statute's provision for compensatory damages to operate retrospectively, because it would attach a new legal burden to the targeted conduct.  *Id*. at 282-283.

Under Minn. Stat. § 181.935(a), an employee injured by a violation of Minn. Stat. § 181.932, "may bring a civil action to recover any and all damages recoverable at law,

---

[5] Prior to this amendment the statute awarded only equitable remedies, with back pay as the primary form of monetary relief. *Landgraf*, 511 U.S. at 252.

11

together with costs and disbursements, including reasonable attorney's fees, and may receive such injunctive and other equitable relief as determined by the court." Additionally, the statute provides that if a violation has taken place, "the court may order any appropriate relief, *including but not limited to* reinstatement, back-pay, restoration of lost service credit, if appropriate, compensatory damages, and the expungement of any adverse records of an employee who was the subject of the alleged acts of misconduct." Minn. Stat. § 181.935(c) (emphasis added).  In cases under Minn. Stat. § 181.932, both compensatory and punitive damages are available to an injured plaintiff.  *See Morrow v. Air Methods, Inc.*, 884 F. Supp. 1353 (D. Minn. 1995) (stating that Minn. Stat. § 181.932 codified the existing common law tort of wrongful discharge and that available legal relief includes compensatory and punitive damages); *Baufield v. Safelite Glass Corp.*, 831 F. Supp. 713 (D. Minn. 1993) (denying new trial after jury award of compensatory damages for violation of Minn. Stat. § 181.932).

As in *Landgraf*, the amendment to 49 U.S.C. § 20109 would operate retrospectively because, by permitting a suit under Minnesota's whistleblower statute and its damages scheme, BNSF would be subject to new liabilities in the form of compensatory and punitive damages.  Congress did not clearly indicate its intent that the amendment to 49 U.S.C. § 20109 be given retroactive application.  Therefore, the presumption against retroactive application applies and Bee's suit is preempted.

Even if this were not true, Bee's suit would fail.  The Minnesota Whistleblower Act prohibits retaliation against an employee who "in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an

employer or any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. (1)(a). Claims under Minn. Stat. § 181.932 are analyzed under the *McDonnell Douglas* burden-shifting test. *Cokley v. City of Otsego,* 623 N.W.2d 625, 630 (Minn. App. 2001), *review denied* (Minn. May 15, 2001); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569 (Minn. 1987). Under this test, the employee must first establish a prima facie case of retaliatory discharge under Minn. Stat. § 181.932, subd. (1)(a), by showing: (1) statutorily protected conduct; (2) adverse employment action; and (3) a causal nexus between the two. *Cokley*, 623 N.W.2d at 630. If the employee can establish a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nonretaliatory reason for its action. *Id.* If the employer meets its burden of production, the employee must demonstrate that the employer's articulated justification is pretextual. *Id.* At all times the employee has the burden to prove by a preponderance of evidence that the employer's action was taken for an impermissible reason. *Phipps,* 408 N.W.2d at 572.

Even assuming that Bee could show that his conduct was statutorily protected, he has not established a causal link between his termination and the protected conduct and, therefore, cannot establish a prima facie case. Further, even if Bee could establish a prima facie case, BNSF has met its burden of production to show that Bee was terminated for a legitimate, nonretaliatory reason, namely Bee's decision to leave work without notifying a supervisor and to submit a time sheet claiming hours that he had not worked. Bee admitted these violations of BNSF's policies in his disciplinary hearings and in his

13

deposition in this case and he has not met his burden to show that BNSF's reason was pretextual.

## CONCLUSION

At the time of Bee's termination, the FRSA preempted claims under Minnesota's Whistleblower Protection Act and required that claims of retaliation be brought before the FRA. Bee's claims against BNSF are preempted by the FRSA and subsequent amendments to that statute do not apply retroactively. The Court, therefore, grants BNSF's motion for summary judgment and dismisses Bee's complaint.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendant BNSF Railway Company, d/b/a Burlington Northern Santa Fe Railway Company's Motion for Summary Judgment (Doc. No. 15) is **GRANTED**.

2. This matter is **DISMISSED WITH PREJUDICE** in its entirety.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  September 29, 2008             s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       Judge of United States District Court